AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of New Hampshire

SEALED DOCUMENT

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>50 Bowers Street,<br>Apartment #3, Nashua, New Hampshire | )<br>)<br>)<br>)<br>)<br>)    Case No. 21-mj- 14-01-AJ |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, which is attached hereto and incorporated herein.

located in the _____ District of ____ New Hampshire ____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, which is attached hereto and incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(a)(6) | False Statements in Acquistion of a Firearm |
| 18 U.S.C. § 922(g)(3) | Possession of a firearm by an unlawful user of a controlled substance |

The application is based on these facts:
See attached affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under
18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ James Martin
*Applicant's signature*

James Martin, ATF, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

**Telephonic conference** *(specify reliable electronic means).*

Date: **Jan 19, 2021**

*Judge's signature*

City and state: Concord, New Hampshire

Andrea K. Johnstone, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION
## UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, James Martin, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal
Rules of Criminal Procedure for a warrant to search the premises known as 50 Bower Street,
Apartment 3, Nashua, NH, hereinafter "PREMISES," further described in Attachment A, for the
things described in Attachment B, including cellphones.

2.      The applied-for warrant would authorize the forensic examination of the seized
cellphones for the purpose of identifying electronically stored data particularly described in
Attachment B.

3.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and
Explosives (ATF), and have been since November 27, 2017. I have over twenty years of law
enforcement experience. My assignments include investigating criminal violations of federal
firearms statues, arson statues, and narcotics offenses related to the possession and distribution of
controlled substances. I have attended and completed the Federal Law Enforcement Training
Center (FLETC) Criminal Investigator Training Program, ATF Special Agent Training Program,
FLETC Basic Law Enforcement School, Federal Air Marshal Training School, New Hampshire
Police Standards and Training Counsel Full Time Police Officer School and several post
academy schools.

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18 U.S.C. § 922(g)(3), possession of a firearm by an unlawful user of a controlled substance, and Title 18 U.S.C. § 922(a)(6) have been committed by Alyssa GREENE. There is also probable cause to search the PREMISES described in Attachment A for evidence of these crimes, as described in Attachment B.

## RELEVANT STATUTES

6.      Title 18, United States Code, Section 922(g) reads in pertinent part,

It shall be unlawful for any person . . . who is an unlawful user of . . . any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)) . . . to . . . possess in or affecting commerce, any firearm.

18 U.S.C. § 922(g)(3). An unlawful user of a controlled substance is someone who is a current user of a controlled substance in a manner other than as prescribed by a licensed physician, and unlawful use must have occurred recently enough to indicate that the individual is actively engaged in such conduct.  It is not required that such a person use drugs at the precise time that the person possesses a firearm.  27 C.F.R. § 478.11.

7.      Title 18, United States Code, Section 922(a)(6) reads in pertinent part,

It shall be unlawful for any person in connection with the acquisition or attempted acquisition of any firearm or ammunition from a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, knowingly to make any false or fictions oral or written statement...intended or likely to deceive such importer,

2

manufacturer, dealer, or collector with respect to any fact material to the lawfulness of the sale or disposition of such firearm.

## PROBABLE CAUSE

8.      On December 24, 2020, I received a phone call from an employee from Affordable Firearms, a Federal Firearms Licensee (FFL# 6-02-001-01-9H-33739), located at 122 Bridge Street, Pelham, NH 03076, that Alyssa GREENE has purchased five (5) firearms and has attempted to purchase another five (5) firearms from Affordable Firearms.  These purchases or attempted purchases have taken place on four (4) different occasions dating back to April of 2020.

9.      I reviewed and obtained copies of the Bureau of Alcohol, Tobacco, Firearms and Explosives Firearms Transaction Record, Form 4473, for each transaction. Those forms show that:

- On April 11, 2020, GREENE purchased the following two firearms: (1) Glock, model 23, caliber .40 pistol bearing serial #RYS503; and (2) Glock, model 27, caliber .40 pistol bearing serial #KZY286;

- On April 15, 2020, GREENE purchased the following firearm: Glock, model 27, caliber .40 pistol bearing serial # MCC173;

- On November 5, 2020, GREENE purchased the following two firearms: (1) Glock, model 17, caliber 9mm pistol bearing serial #2043LAV; and (2) Glock, model 22, caliber .40 pistol bearing serial # AAHE047; and

- On December 23, 2020, GREENE attempted to purchase the following five firearms: (1) Taurus, model G3c, caliber 9mm pistol bearing serial #

3

ABM250747; (2) Taurus, model G3c, caliber 9mm pistol bearing serial #
ABM250672; (3) Glock, model 23, caliber .40 pistol bearing serial # LLM230;
(4) Glock, model 43, caliber 9mm pistol bearing serial # AEYN402; and (5)
Ruger, model SR9c, caliber 9mm pistol bearing serial #332-53603.

10.     I observed that on each of the 4473s, GREENE identified the PREMISES as her current residence.

11.     I also observed that GREEN answered "yes" to Question 21.a., which asks, "Are you the actual transferee/buyer of the firearm(s) listed on this form and any continuation sheet(s)....? **Warning: You are not the actual transferee/buyer if you are acquiring the firearm(s) on behalf of another person.**" This question is material to determining whether the purchase of the firearm is lawful as it is unlawful to purchase a firearm on behalf of another person.

12.     I observed that GREEN answered "no" to Question 11.e. which asks, "Are you an unlawful user of, or addicted to, marijuana or any depressant, stimulant, narcotic drug, or any other controlled substance? **Warning: The use or possession of marijuana remains unlawful under Federal law regardless of whether it has been legalized or decriminalized for medicinal or recreational purposes in the state where you reside.**" This question is material to determining whether the purchase of the firearm is lawful as it is unlawful for a person who is an unlawful user of a controlled substance to possess a firearm.

13.     Each 4473 also contains the following certification, which GREENE signed on each form:

4

**I certify that my answers in Section B are true, correct, and complete....I also understand that making any false oral or written statement, or exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a felony under Federal law, and may also violate State and/or local law. I further understand that the repetitive purchase of firearms for the purpose of resale for livelihood and profit without a Federal firearms license is a violation of Federal law.**

14. On December 29, 2020, I spoke with Rick Mitchell, an employee of Affordable Firearms, who said that when dealing with GREENE, she did not seem familiar with firearms. According to Mitchell, when GREENE would ask to look at a firearm she would say "that one" and point to it. Mitchell said that on December 23, 2020, GREENE showed him photos of firearms on her cellphone and asked if they had those particular firearms in stock.

15. On December 30, 2020, Special Agent Patrick Dawley and I spoke with GREENE at 50 Bower Street in the shared hallway of the building that lead to all apartments, including the PREMISES. While we spoke, GREENE was holding a cell phone with a light purple protective case. The phone appeared to be a smart phone, unknown make or model. I would describe the phone as similar to an iPhone in shape and size. GREENE at first said she has purchased a total of twelve (12) firearms, all from Affordable Firearms. GREENE could not provide details of the firearms but said that she kept the firearms in a safe in her bedroom closet. GREENE also stated that she goes to a shooting range about twice a month, including at a place near the Manchester, New Hampshire, airport, and at another range "deeper" in New Hampshire. I asked her if I could see the guns, and GREENE told me that her eight year old son was sleeping but that

5

she would allow us to look at the firearms if she could have some time to wake her son up and get him out of the apartment first. Special Agent Dawley and I agreed to wait.

16.     GREENE went in the PREMISES and, within five minutes, GREENE ran out of the apartment building, yelling that the safe and all the firearms were gone. GREENE was still holding a cellphone with a light purple protective case. GREENE was crying and kept saying this looked bad. I asked GREENE if she wanted to report the firearms stolen. GREENE said she did and agreed to meet me and Special Agent Dawley at the Nashua Police Department ("NPD") in approximately 20 minutes.

17.     Special Agent Dawley and I left the PREMISES and traveled to the NPD to coordinate with NPD in taking GREENE's complaint.  Special Agent Dawley and I waited approximately 50 minutes; GREENE never showed up at the NPD.

18.     Special Agent Dawley, NPD Officer Jon Turcotte, and I returned to the PREMISES.  We met with GREENE in the common hallway.  I observed that GREENE had changed her clothes and was now holding a black cell phone and had one ear bud in her left ear.  The earbud was white and looked similar to an Apple Air Pod. The phone was a smart phone of unknown make. Officer Turcotte later reported to me that he observed a green bar on the screen of the cellphone when we met with GREENE in the hallway.  In my experience, this typically indicates that the phone is being used for a phone call and I believe that GREENE may have been on the phone when we spoke to her.

19.     When we met with GREENE, I could smell a strong odor of burn marijuana. This odor was not present earlier during my initial encounter with her. I asked

6

GREENE if she had used marijuana and GREENE admitted she had. GREENE continued to say she uses marijuana for anxiety.

20.      GREENE told us that she was waiting for a babysitter, who she expected to arrive in fifteen minutes, and would then go to the police station to report the firearms stolen.

21.      While in the hallway, Officer Turcotte spoke with GREENE about the firearms. GREENE stated that all seven (7) firearms were missing. GREENE said she kept all the firearms in the safe along with one box of ammunition. GREENE said she had thrown out all the paperwork and boxes (that come with the firearms) and did not have any information on the firearms.

22.      GREENE said that her apartment had maybe been vandalized. She said she had gone to New York City on December 15, 2020, and returned on December 16, 2020, but did not provide details.  GREENE said that when she returned she noticed stuff in her bedroom had been moved around. GREENE said she did not look to see if anything was missing and did not contact the police.  GREENE said that maybe someone had entered in the apartment through a fire escape or through the door because it did not lock properly. GREENE also said she does not know anyone in Nashua and was not having issues with anyone.

23.      Officer Turcotte asked GREENE to describe the range she had mentioned to me and Special Agent Dawley earlier.  GREENE said that she had last gone shooting in early December, 2020. GREENE could not provide any details about the range other than it was a brick building with red lettering. For example, GREENE could not provide any

7

details on the size of the building, the number of shooting lanes, or the paperwork and procedures required to use the facility. GREENE then said the firearms could be in storage in the basement or in a storage unit in Dracut, Massachusetts.

24.     GREENE allowed Officer Turcotte to enter the PREMISES and examine the bedroom closet where GREENE said the firearms were kept. Special Agent Dawley and I remained in the hallway outside of the PREMISES. Officer Turcotte told me that GREENE showed him a small safe in her closet that she said was similar to the one in which the guns were stored.  Officer Turcotte described it as a document safe that would store paperwork, passports, and other small items. Officer Turcotte said that in his opinion the safe may hold two (2) or three (3) firearms but would not hold seven (7).

25.     Officer Turcotte also advised that he observed three (3) cell phones in the PREMISES– two on GREENE's person, and one on the bed charging.  All appeared to be smart phones.  Officer Turcotte advised that based on where he saw all three phones, he believed that she actively used all three of them.  Officer Turcotte also said that he observed marijuana and marijuana paraphernalia in GREENE's bedroom.

26.     Officer Turcotte and GREENE then examined the storage unit in the basement of the apartment building and were unable to locate any firearms. I again asked GREENE where the firearms were. I explained to GREENE that I was concerned that the firearms could be used in crimes and that I wanted GREENE to tell me who she had given the firearms to. GREENE denied giving the firearms to anyone.

27.     GREENE then asked to speak with Officer Turcotte privately. Special Agent Dawley and I exited the building. After a few minutes Officer Turcotte and

8

GREENE exited the building and GREENE said the firearm were not in Dracut, Massachusetts, but continued to say they were stolen. GREENE said she had spoken to her babysitter and she would meet us at the police station to report the firearms stolen as soon as the babysitter arrived.

28.     Officer Turcotte, Special Agent Dawley, and I left the residence and returned to the NPD. GREENE did not show up at the NPD.  After approximately 90 minutes, I contact GREENE by telephone. GREENE said she was texting with her attorney and wanted her attorney present. GREENE said they would go to NPD the following day, on Thursday December 31, 2020, to make a report. GREENE said the attorney wanted to know where the case was filed before allowing her to give his name to me.  As I spoke to GREENE she kept switching lines on the phone, alternating talking to me and someone else. GREENE said the attorney's first name was very difficult to pronounce but provide the last name of Mixon and a phone # of (978) 790-5462.

29.     At the end of the call with GREENE, I left a voice message for Attorney Mixon. Later in the day, Attorney Mixon returned my call and said he had been contacted by a third party about GREENE and firearms in Lowell, Massachusetts.  At no time during my interactions with GREENE or Officer Turcotte's interactions with GREENE did she ever mention that the firearms were located in Lowell, Massachusetts. Attorney Mixon advised he would not disclose the identity of the third person. Attorney Mixon also told me that he does not represent GREENE because he does not practice law in New Hampshire.

30.     Special Agent Dawley contacted Manchester Firing Line, a firearms store and shooting range in Manchester, New Hampshire, and the only firing range near the Manchester Airport. Special Agent Dawley learned that Manchester Firing Line had no record of GREENE shooting at the facility in early December, 2020.

31.     On January 5, 2021, I spoke with GREENE at Affordable Firearms. I had arrived to pick up some documents and GREENE was speaking with an employee. I spoke with GREENE as she exited the store. GREENE advised me that she is having car trouble and needed money so she had cancelled purchase and asked to have her money returned. GREENE told me that she believed Attorney Mixon was going to represent her. I advised GREENE that Attorney Mixon said he was not. GREENE said she was going to hire a different lawyer and we concluded the conversation.

32.     Based on my training and experience, I know that the straw-purchase of a firearm occurs when a person purchases a firearm or firearms at the request of another person, typically for someone who cannot legally purchase a firearm on their own due to prior criminal convictions, drug use, or other legal prohibition. Straw-purchasers typically are not familiar with common firearm terminology and specifics about the type of firearms and the amount of firearms purchased.

33.     Based on my training and experience, I believe GREENE to be straw-purchasing firearms for an unknown individual. GREENE purchased and attempted to purchase multiple firearms of the same or similar make and model; this is atypical for a gun collector or someone buying guns for a personal collection. It was reported to me that GREENE appeared to be unfamiliar with firearms and was relying on her phone when

10

selecting firearms to look at while at Affordable Firearms. In addition, she no longer had any of the firearms she purchased, claimed they were stolen, but then never reported them stolen. In my training and experience, her conduct is indicative of someone straw-purchasing firearms for others.

34.     Based on my training and experience it is common for persons to use cell phones to send photos and information via text, email and social media applications about firearms, firearms accessories and ammunition that they wish to have purchased by the straw purchaser. Additionally, in my training and experience, the straw purchaser commonly is not familiar with firearms and common firearms term and uses cell phone to gather information from multiple sources the persons involved will also conduct internet searches to research the firearms and firearm accessories or firearm terms.

35.     Based on my training and experience it is common for  persons involved in straw purchasing or firearms trafficking keep records of firearms purchases (boxes, receipts) etc., or other types of evidence of straw purchase or information about the other person for which the firearms was purchased for.

36.     Based on my training and experience, I am aware that firearms traffickers and drug traffickers commonly use cellular telephones to communicate and further their illegal activities, including to communicate with drug customers and individuals conducting straw-purchases of firearms for them. I am also aware that individuals who use drugs commonly use cellular telephones to arrange to purchase drugs and to discuss their use of drugs. I am also aware that those engaged in the straw-purchase of firearms

11

often use cellular telephones to communicate with those for whom they are straw-purchasing firearms.

## TECHNICAL TERMS

37.    Based on my training and experience, I use the following technical terms to convey the following meanings:

a.    Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

12

b.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another

13

location.  These devices can contain records of the addresses or locations involved

in such navigation.  The Global Positioning System (generally abbreviated

"GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite

contains an extremely accurate clock.  Each satellite repeatedly transmits by radio

a mathematical representation of the current time, combined with a special

sequence of numbers.  These signals are sent by radio, using specifications that

are publicly available.  A GPS antenna on Earth can receive those signals.  When

a GPS antenna receives signals from at least four satellites, a computer connected

to that antenna can mathematically calculate the antenna's latitude, longitude, and

sometimes altitude with a high level of precision.

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used

for storing data (such as names, addresses, appointments or notes) and utilizing

computer programs.  Some PDAs also function as wireless communication

devices and are used to access the Internet and send and receive e-mail.  PDAs

usually include a memory card or other removable storage media for storing data

and a keyboard and/or touch screen for entering data.  Removable storage media

include various types of flash memory cards or miniature hard drives.  This

removable storage media can store any digital data.  Most PDAs run computer

software, giving them many of the same capabilities as personal computers.  For

example, PDA users can work with word-processing documents, spreadsheets,

14

and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.   Tablet:  A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook that is primarily operated by touching the screen.  Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise.  Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions.  Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.   Pager:  A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network.  Some pagers enable the user to send, as well as receive, text messages.

h.   IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is,

15

long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

38.     I know through my training, knowledge and experience that persons often utilize modern smartphones and typically have them on or near their persons throughout the normal course of daily activity. I know that persons often keep their smartphone devices and SIM cards with them on their person, inside of their residence and inside of motor vehicles, along with other regularly utilized personal affects.

39.     Based on my training, experience, and research, I know that cellphones like those observed in the PREMISES and used by GREENE typically have the capabilities that allows each to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

40.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are

16

found. One form in which the records might be found is data stored cellphones. Thus, the

warrant applied for would authorize the seizure of electronic storage media or, potentially,

the copying of electronically stored information, all under Rule 41(e)(2)(B).

41.     Based on my knowledge, training, and experience, I know that electronic

devices, including cellphones, can store information for long periods of time. Similarly,

things that have been viewed via the Internet are typically stored for some period of time

on the device. This information can sometimes be recovered with forensics tools.

42.     *Probable cause.* I submit that if cellphones are found on the PREMISES,

there is probable cause to believe that evidence of the listed crimes will be stored on that

storage medium, including cellphones. Moreover, as further described in Attachment B,

this application seeks permission to locate not only electronically stored information that

might serve as direct evidence of the crimes described on the warrant, but also forensic

evidence that establishes how the cellphones were used, the purpose of its use, who used

it, and when. There is probable cause to believe that this forensic electronic evidence

might be on the cellphones because:

> a.  Data on the storage medium can provide evidence of a file that was once on the
>
>     storage medium but has since been deleted or edited, or of a deleted portion of a
>
>     file (such as a paragraph that has been deleted from a word processing file).
>
> b.  Forensic evidence on a device can also indicate who has used or controlled the
>
>     device. This "user attribution" evidence is analogous to the search for "indicia of
>
>     occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

43.    *Necessity of seizing or copying entire storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the cellphone's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to

18

prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

    a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

    b. Technical requirements. Computers, including cellphones, can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

44. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## **CONCLUSION**

45.     I submit that this affidavit supports probable cause for a warrant to search the

PREMISES described in Attachment A and seize the items described in Attachment B.

                                        Respectfully submitted,


                                        /s/ James Martin
                                        James Martin
                                        Special Agent, ATF



The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim.
P. 4.1 and affirmed under oath the content of this affidavit and application.

                                        Honorable Andrea K. Johnstone
                                        United States Magistrate Judge

21

## ATTACHMENT A

*Property to be searched*

The property to be searched is **50 Bowers Street, Apartment #3, Nashua, New Hampshire,** including the person of Alyssa GREENE. The property is further described as brick apartment building at the corner of Bowers Street and Harbor Street in Nashua, New Hampshire, with a parking lot located on the right side of the building on Bowers Street. Apartment number three (3) is located on the right at the top of the stairs, and has windows that face Bowers Street.

This warrant authorizes the forensic examination of any electronic devices, including cellphones, seized from 50 Bowers Street, Apartment #3, Nashua, New Hampshire, pursuant to this warrant, for the purpose of identifying the electronically stored information described in Attachment B.

22

**ATTACHMENT B**

*Property to be seized*

1.       All records and items relating to violations of 18 USC 922(a)(6) and 18 USC

922(g)(3), involving Alyssa GREENE and occurring on or after March 20, 2020, including:

   a.  Records, materials, and information relating to firearms, including the acquisition

   and disposition of firearms, as well as dates, places, and remuneration for specific

   transactions;

   b.  Information reflecting contact or communication with others regarding the

   acquisition and disposition of firearms, including regarding dates, places, and

   remuneration for specific transactions;

   c.  Records and information related to use and sources of drugs (including names,

   addresses, phone numbers, or any other identifying information);

   d.  Any information regarding or involving travel to purchase or dispose of firearms;

   e.  Records and information related to the location of firearms purchased by

   GREENE; and

   f.  Records and information related to the identity of any individual who may have

   possessed or is in possession of any firearm purchased by GREENE.

2.       Controlled substances including, but not limited to marijuana;

3.       Drug use paraphernalia;

4.       Firearms and firearms accessories;

23

5.      Materials, documents, and records evidencing the receipt of large amounts of cash including bank statements and related records, and other items evidencing the receipt of money in exchange for firearms.

6.      Indicia of possession of the placed to be searched, including articles of personal property, such as personal identification, diaries, utility bills, and notes, tending to establish the identity of the person or persons in control of the area to be searched.

7.      Records of firearms purchases, sales and transfers and profits derived from.

8.      Information reflecting contact or communication with coconspirators, distribution of firearms to others.

9.      Cellphones and other electronic communication devices used by GREENE.

10.     For any cellphone whose seizure is otherwise authorized by this warrant:

    a.   evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

    b.   evidence indicating the user's state of mind as it relates to the crimes under investigation;

    c.   evidence of the times the cellphones was used;

    d.   passwords, encryption keys, and other access devices that may be necessary to access the cellphone;

    e.   records of or information about the cellphone's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite"

24

web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

f. contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).